Please call the first case. 112-3750, Brookings, Wisconsin v. Walters Food Center. Counsel, you may proceed. May it please the court, my name is Charles Webster, attorney for the appellant. Good morning. This case is about a slip-and-fall accident on a job, and there's a video that I'd like to show the Supreme Court here. The video was admitted to evidence, and it is in the record, but could I have leave to show it to the court now? No, it's in the record, and we'll have it available for all of us. All right. The video shows a hard fall, and there's no question that she was in the scope and course of her employment. After this accident, she had injuries and complaints of pain that she'd never had before. That's the big issue in the case. The respondent claims that she had prior right shoulder treatment, but she didn't. All they have is, and this is in the record also, a diagram. I might have given the wrong page number when I cited my brief. It's a stick diagram, page 1093. It's 40 days before the accident. She was treated with the same doctor. She made some squiggles or circles, which is supposed to be simple for pins and needles, across her right shoulder blade. That's the only evidence that they have of any prior complaint of any right shoulder pain. Well, let me ask you this. Wasn't the arbitrator concerned about the claimant's credibility? Yes, he was, and I think mistakenly so. I think if you look at the record closely, I don't think she made any misstatements. There were some I don't knows about medical treatment, prior medical treatment. There were some statements. The only misstatement that she made was about hydrocodone. Right. He found that she testified falsely that she denied taking it prior to November 1, 2000. If you look closely at that answer, which is in page 037 and 038, she said she was, she gave kind of a lengthy answer with three sentences. One sentence was about, I was never prescribed hydrocodone before the accident. She may have been taking it, probably was taking it, maybe for her husband's supply, or it's not clear in the record. But she explained it, saying she wasn't prescribed it. And at most, that's a mere mistake. It does not justify denying an award for an accident where the video shows a hard fall and she had complaints that she never had before, where the respondent's IME admits that she did not have a shoulder separation before, admits that this fall could cause a shoulder separation, and he disputes the nature of the treatment, but he admits that this fall could cause a shoulder separation. Well, she had a number of claims, shoulder, carpal tunnel. She claimed injury to a number of parts of her body, correct? All right. We did file a separate claim for carpal tunnel, but as the evidence involved, we had no support for that, so I'm not going to argue that today. You're withdrawing the argument on the carpal tunnel? Yeah. We had no argument on carpal tunnel. Okay. Because I think it was part of her faith. There's some evidence, but not enough to sway anybody, as it turns out. So she did have several claims, but there was no treatment for her right shoulder prior to this occurrence. She was treated for other body parts prior to this occurrence, and she actually had therapy to her left shoulder by Dr. Weber. Dr. Weber's office notes show therapy to the left shoulder, and there's one note from the therapy records showing range of motion. These are all pre-accident. Those are showing range of motion of the right shoulder, but no complaints of shoulder pain, certainly no treatment, and the only pins and needles across the shoulder blade 40 days before the accident. Well, what did Dr. Weber testify to? What was his conclusion regarding the right shoulder? Well, he gave two depositions. First deposition, he said that the most likely cause of her right shoulder pathology was the accident. Interoperatively, he found a rotator cuff tear, which he repaired, and that was his suspicion. That was his initial report. His initial report. Then he viewed the video of the claim in slip and fall. Then we had a deposition concerning the video, and that deposition of Dr. Weber was limited to the video. I tried to ask at least one question about work restrictions or prognosis that was objected to by response counsel on the ground that this video was to be limited to the video, and that's what the doctor limited his testimony to, and I limited my questions to, is the video. Didn't ask about the other clinical signs and symptoms that were at the basis of the opinion. He said this video alone is plausible. That's not the right standard, but that's with his comment on the video only. He never retracted his prior comments in his prior deposition, his prior report, that this accident was the most likely cause of the shoulder pathology. Let's assume that that's true. What did Dr. Walsh testify to? He testified he did not believe the claimant's rotator cuff tear was caused by the accident. Dr. Andrew Walsh, yes. He said the rotator cuff was not caused by the accident. He said she would have more complaints of pain. She had a good range of motion. You're right, but I think that, and I know you can't weigh evidence, but I guess the manifest weight, I think, is that some injury, some shoulder injury was caused by this accident, and the credibility of the plaintiff was supported by medical records. She claimed she said she had neck pain, and Dr. Lucan saw her prior record showing, prior to the accident, prior record of EMG of the cervical or upper extremities, and he compared that to the EMG that he ordered after the accident and showed significantly worse nerve contact, and so there's corroboration that there are increased complaints, corroboration of aggravation of increases in condition. That was Dr. Lucan's theory concerning the cervical region from the get-go. In his initial report, before he was deposed, he put in the report, he commented on the prior EMG that was taken a couple of months before the accident by the same electrophysiologist or electroneurologist who did the post-accident EMG, Dr. Ilmaz from Ingalls Memorial Hospital, and he said that comparing the two studies showed significantly increased pathology, so there's corroboration of her testimony by the medical records. Another, all of those arguments are about the manifest way, which I think is. All right, so you covered the right shoulder, the cervical, you've withdrawn on the carpal tunnel. Correct. What are the other areas that are in dispute now? Is that it? Well, the physical areas, that's it, shoulder and neck. But another dispute, of course, is Federal Rule of Evidence 703 and 705. Their expert Walsh had documents that were never identified, never produced, never described. There's no way to say that they're reasonably reliable. There's no way to say what they are. We have no knowledge of what they are. Well, he specifically described in his opinion letter, his Section 12 opinion letter, a job description, that he had received a job description from the employer. Right? Yes. And that was identified. That was, I don't think that was in the file, and it was not produced, and there's no statement that that was the only unidentified record or only unacknowledged record. How do we know from the record there was anything else from this record? The doctor never said so. Did you ask him? Yes, I did. In the deposition? I asked for the records to be produced or objected to. Did you ask what they were, what records he got, or have him describe them in the deposition? No, I didn't ask him to describe them. I asked for their production, and they were not produced. And in response to that, counsel did not instruct his witness to reveal what they were, did not, and in his question to the witness, Dr. Walsh, a couple of his questions, he said, excluding the unidentified records, what's your opinion? But for some of the questions, particularly about the neck, he didn't say excluding the unidentified records, what's your opinion? So I think Dr. Walsh's testimony is contaminated. I think it's fruit of the poison tree. I think his deposition should be stricken. And I cited a case, a pre-Wilson v. Clark case, where that was the remedy for relying on hearsay documents. I think it's entirely appropriate. We also have an argument about Section 12. As an IME doctor, he's supposed to produce an exact duplicate of the report that he gives to a respondent. And I think that when his report alludes to unidentified documents that have not been provided to us, he's not really giving the same report to us that he's giving to the other side. So I think there's a violation of Section 12, which I think is a question of law that can be considered by this Court de novo. The arguments about Federal Rule of Evidence 703 and 705, I think that's an abuse of discretion standard. And ‑‑ Counsel, let me ask you this. Didn't you file a brief in the circuit court acknowledging that Dr. Walsh testified that he did not rely on these documents with respect to his testimony concerning the claimant's shoulder? Did you make that acknowledgment? No, I didn't. I think I carefully parsed out that some of the questions he was asked were, please do not consider the unidentified documents. The other questions he was asked did not have that caveat, and so I think that there is some fruit of the poison tree and we're prejudiced by it. The bottom line is that this is a case where there's a hard fall, and she's entitled to some sort of treatment, and she has new complaints after this accident, and I think she's entitled to TTD, some medical bills, PTD, and I think it was against the manifest way to totally deny her. Counsel, you'll have time in the floor. Thank you. Good morning. May it please the Court. Counsel. My name is Tom Cronin. I'm here on behalf of the defendant and appellee, Walsh Foods. You know, I apologize in advance for the duration that I spent in my brief discussing the Wilson v. Clark issues, the federal rules of evidence issues, and while I stand by my position there, I think what's important to realize with regard to Dr. Walsh is this. Dr. Walsh testified twice. The first time he testified on May 24th of 2011 with regard to two different reports. I went through his entire first report, and he gave opinions in that first report, including the opinion that the rotator cuff tear was not caused during the fall and that there was no evidence of any cervical injury. All of that testimony took place before any objection with regard to this particular job description. The particular job description, by the way, was described in detail in Dr. Walsh's report. But regardless, there were opinions regarding the relevant issues in this case prior to any objection. Secondly, he testified a second time on September 15th of 2011 after viewing the videotape. This case involves what happened in this fall and whether it was causally related. Dr. Walsh testified a second time with no objections regarding the videotape, saying that the fall depicted in the video did not cause the rotator cuff injury and did not cause the cervical injury. So even if we assume for purposes of argument that counsel's position with regard to Wilson v. Clark and the Federal Rules of Evidence was correct, which I don't agree with, but for purposes of argument, there are still opinions in the record by Dr. Walsh with regard to the relevant issues. Counsel, with regard to the manifest weight, the claimant had some medical support for a testimony. Dr. Lucan provided some support, did he not? He did initially. He provided support in a written report, which counsel refers to. But with regard to Dr. Lucan's testimony, I think he gave an evidence deposition subsequent to all of that. The last opinion that Dr. Lucan gave in his April 19, 2011 report is that his causal opinion relied upon the accuracy of petitioner's history to him. What he said was two things. She denied any prior complaints to Dr. Lucan with regard to her cervical spine. And we know that that's not accurate. And the commission found that that was not accurate based upon medical records that were admitted. He also said the history she gave him was of relentless pain in the neck, right shoulder, radiating down the right arm, and numbness of the right thumb since November 1 of 2009. I asked Dr. Lucan, if that wasn't accurate, you would agree that you couldn't give that causal opinion? Dr. Lucan agreed. That was his last testimony. The commission found that that history wasn't accurate. Dr. Weber, who treated the petitioner after the accident all the way up until the time the petitioner started treating for her cervical spine, which wasn't for 10 or 11 months, Dr. Weber never treated her for her cervical spine and never made any diagnosis with regard to her cervical spine. So the records are absent that the history that Dr. Lucan relied on of this relentless pain. Dr. Lucan specifically said this is the last testimony of his deposition. There was no redirect rehabilitating him, saying that if that history wasn't true, he could not give a causal opinion. Okay. Well, she said there's no causal connection, and now you're saying Lucan gave sort of a qualified. Right. And I think that he withdrew it. And so the commission's finding that the records don't support that history is fully supported by the record. With regard to the shoulder, there's been discussion of this pain diagram. The reason the pain diagram is significant is because the pain diagram depicts pain in the right shoulder blade going down the right arm. Why is that important? It's not the typical, you might not think, oh, is that rotator cuff pain. Well, what Dr. Weber testified to is that she didn't present with typical rotator cuff pain. Instead, he said, she presented with parascapular pain. Doctor, what does para mean? He said around. What's the scapula? He says the shoulder blade. So that pain diagram is significant because it clearly demonstrates that she presented in September of 2009, more than a month before the accident, with the exact same presentation that she had to Dr. Weber when she started treating with regard to the shoulder. The commission found that that was significant. They found that that pain diagram was significant. The other thing is, she denied to Dr. Weber prior shoulder complaints. Dr. Weber testified that if he found out she had prior shoulder complaints, his opinion could change. And our position is that that pain diagram demonstrates that she had the same complaint. And then finally, I also move to the last testimony of Dr. Weber. Dr. Weber's last testimony given in this case is, I can't say that she actually tore her rotator cuff based upon watching that video. That's his opinion. Again, not rehabilitated. He said it's plausible, and the commission found rightly that that's the case. So your argument is simple. You've got neutral evidence not weighing one way or the other. You've got clear testimony from Walsh denying any causal connection and lukewarm testimony from Weber. Correct. And you're saying it's not against the man who tore the arm? Exactly, Your Honor. Okay. Thank you. Thank you, counsel. Counsel, you may reply. Thank you. Dr. Luke had talked about aggravation. He said if the history was not accurate, then the causal connection is more attenuated. But he never said that there was no causal connection, and he explained that he was talking about aggravation. And Dr. Weber, yes, he said something like, based on watching that video, I can't, it's only plausible. But in that answer, he wasn't referring to his other clinical evidence. He wasn't asked about his other clinical evidence. He wasn't asked to repeat his testimony about the interoperative findings. He just was commenting on the video. The video alone, he's saying, is inconclusive. But his other testimony, based on his clinical evidence, is conclusive. It's regarding neck pain after November 1, 2009. You have the chiropractic records from Dr. Sheets. He was treating her for her neck, and he records complaints of neck pain. He says her neck pain is much worse after November 1, 2009. I think that this is a case of circumstantial evidence, where a patient has a previous condition of good health of her right shoulder. She has no actual treatment to her right shoulder. She has an accident and a subsequent injury. And I think that the causal nexus can be inferred based on circumstantial evidence. Thank you. Thank you, counsel. This matter will be taken under advisement. A written disposition shall issue.